## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

JOHNNY WEBBER and
DEBORA WEBBER,

                Plaintiffs,

      vs.

ROGER BUTNER,

                Defendants.

CASE NO. 1:16-cv-01169-TWP-DML

District Judge
Hon. Tanya Walton Pratt

Magistrate Judge
Hon. Debra McVicker Lynch

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF
### MOTION TO STRIKE AFFIDAVIT OF FARHEEN S. KHAN, Ph.D.

Roger Butner asks the Court to take an extremely rare step and end this negligence case on summary judgment. In order to do so, he asks the Court to construe his duty as a landowner to invitee Johnny Webber[1] more narrowly than Indiana law requires. Regardless of which of the numerous paths available is taken, the result is the same: Butner had a duty to tell Webber, a non-professional, of a warning provided by a professional logger to not have anyone other than professionals cut the trees. In fact, the knowledge Butner gained from that warning extended his duty even further: Butner was obliged to not send Webber out to cut the dangerous trees at all.

While the question of duty in a negligence action can occasionally be adjudicated by Rule 56, Butner attempts to reach even further by arguing for summary judgment on the issue of causation. In doing so, Butner hangs his hat entirely on the opinion of his would-be expert Farheen S. Khan, Ph.D. But, as exposed in her deposition, Khan's opinion is based on meritless

---

[1]    Butner also argues that Debora Webber's loss of consortium claim should fail because her consortium action is cannot be advanced if her husband's primary claims fail. [ECF 34 at 14]. Because Johnny's claims should advance to trial, so too should Debora's.

assumptions and facts that contradict uncontroverted evidence in this case, and is otherwise so devoid of merit and lacking in even a rudimentary foundation that it is not admissible on summary judgment.

As with virtually every negligence case, summary judgment cannot be granted here.

## I.  Statement of Material Facts In Dispute

On April 17, 2014, Roger Butner purchased a 47.6-acre property in Everton, Indiana. [Exh. A at 11:6-15]. The property was brought to Butner's attention by David Moore. [Exh. B at 10:15-19]. Moore is a professional in the lumber industry, who estimated he had cut down hundreds of thousands of trees in his lifetime. [*Id*. at 4:17–6:19]. Both Johnny Webber and Butner had an existing social relationship with Moore at that time. [*Id*. at 7:15–9:14].

Two or three weeks before Butner closed on the property, Moore visited it with Butner to determine whether Moore wanted to buy trees from the property. [*Id*. at 21:14-24]. Moore opted not to purchase the trees, because they did not suit his needs. [*Id*. at 22:6-14]. Declining to buy the trees, Moore recommended to Butner that he should contact David Shelton, who is also in the timber industry,[2] to see if Shelton was interested in the trees. [*Id*. at 20:11–19 & 22:23–23:6].

In that same meeting, Moore told Butner that the trees were very dangerous because "[t]hey had a lot of dead limbs on the tops, and some of them were just hanging there. Rotten in the butts." [*Id*. at 22:15–23:17]. In his deposition, Moore testified: "I just told him they were very dangerous trees, that him or -- get me or Mr. Shelton to cut them. And I think even after the accident, I said, 'I told you to get us to do that.'" [*Id*. at 29:5-9]; *see also* [*Id*. at 23:10-13 ("I advised him not to -- I really advised him not to cut them because they were so dangerous.")]; [*Id*. at 50:5-24 (describing conversation with Butner about needing "a professional" to cut the

---

[2]   Shelton estimated he had cut around one hundred thousand trees in his lifetime. [Exh. C at 8:18–9:6].

trees)]. In fact, at their meeting, Moore had volunteered to cut the trees down for free. [*Id*. at 22:15–23:13 & 45:15–46:9].[3]

Butner did not heed Moore's Warning or accept Moore's offer to cut the trees for free. [*Id*. at 50:15-17]. Instead, on April 18, 2014, the day after Butner closed on the property, Butner brought his friend Johnny Webber onto the property to cut down the trees. [ECF 34 at 6]; [Exh. D at Ans. 5]. Prior to Webber agreeing to cut the trees, and before Webber and Butner embarked to the property to do so on April 18, Butner never told Webber about Moore's Warning. [Exh. E at ¶ 6]. Had Butner done so, Webber, who respected Moore's superior opinion and knowledge about trees, would not have tried to cut down the dangerous trees. [*Id*. at ¶¶ 5–6].

Instead, Webber, without the benefit of Moore's warning, proceeded to cut the trees, and, while cutting one of the trees, he was seriously and permanently injured when a branch fell from above and struck him on the head. [ECF 34 at 6]; [Exh. D at Ans. 5].

Only Webber and Butner were present when the branch fell and struck Webber. [Exh. D at Ans. 3]. Neither Webber nor Butner saw the branch fall. [Exh. A at 45:11-12]. Prior to being injured, Webber cut down between five and eight trees. [Exh. D at Ans. 7; Exh. F at 40:15-17]. The trees ranged between 40 and 70 feet. [Exh. D at Ans. 7; Exh. F at 41:8-9]. The tree from which the branch fell was the tallest tree that Webber cut that day. [Exh. F at 41:15-17].

## II.    Standard for Summary Judgment

As the Seventh Circuit has explained, "Summary judgment is appropriate only if the evidence presents no issue of material fact, so that the moving party is entitled to judgment as a matter of law.  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the nonmoving party." *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir.

---

[3]    Butner testified that he has no recollection of Moore offering to cut down the trees. [Exh. A at 19:20–20:15].

2009) (citations omitted). "Although a non-moving party may successfully oppose summary judgment only by presenting 'definite, competent evidence to rebut the motion,' the party is not required to produce evidence which, if believed, would lead to a directed verdict in her favor." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation omitted).

As the non-movant, the Court must "accept all of [Webber]'s evidence as true, drawing all reasonable inferences in his favor, and may not downplay his evidence, or conduct a 'paper trial' on the merits of his claim." *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (citation omitted).

Summary judgment is a particularly inappropriate method for adjudicating negligence claims such as this. As Magistrate Judge Baker summarized:

> Indiana negligence claims "are particularly fact sensitive and are governed by a standard of the objective reasonable person – one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright,* 805 N.E.2d 382, 387 (Ind. 2004). Hence, summary judgment in these types of negligence actions is "**generally seen to be inappropriate**." *Perkins v. Lawson,* 312 F.3d 872, 876 (7th Cir. 2002).

*McCauley v. Nucor Corp.*, No. 1:05-cv-0424-TAB-RLY, 2007 U.S. Dist. LEXIS 9688, at *12-13 (Feb. 9, 2007) (emphasis added); *accord Geisner v. G4S Secure Sols. (USA) Inc.*, No. 1:12-cv-00401-TWP-DKL, 2013 U.S. Dist. LEXIS 128021, at *6, 2013 WL 4804549 (S.D. Ind. Sep. 9, 2013) (Pratt, J.).

## III.   Argument

### A.   Butner Had a Duty to Pass Along Moore's Warning to Webber.

On the morning of April 18, 2014, Butner held one crucial piece of information: David Moore, a tree expert that Webber knew and respected, had said that the trees were very dangerous and should be taken down by a professional. [Exh. E at ¶¶ 4–5]. Had Butner passed that warning along to Webber, the horrific, life-changing injuries that followed would never have

happened. [*Id.* at ¶ 6]. Butner had a duty to pass Moore's Warning on to Webber because Butner was the property owner, because they were co-laborers on a project, and because the *Webb v. Jarvis* analysis dictates a duty exists.

> ### 1.   Butner Breached His Duty of Reasonable Care for Webber's Safety By Failing to Pass Along Moore's Warning.

As a property owner, Butner had a duty to pass along Moore's Warning to Webber because the danger required Butner to protect Webber from foreseeable harms on the property. That duty was not terminated here because the danger was not known and obvious. The evidence shows that the full risk was neither known nor obvious to Webber. More importantly, knowledge and obviousness are a question for the jury under Indiana's comparative fault laws and should not be resolved on summary judgment anyway. And, finally, even if the danger was known or obvious to Webber, Butner still owed him a duty because Butner should have anticipated the harm to Webber, which was the exact harm warned of by Moore.

> #### a.   Butner's Duty of Reasonable Care as a Landowner Required Him to Pass Along Moore's Warning to Webber

Butner acknowledges that he, as the landowner,[4] owed a duty of reasonable care to Webber. [ECF 34 at 11]. Indeed, Indiana law recognizes that the landowner has a duty to protect his invitee. *Rogers v. Martin*, 63 N.E.3d 316, 320 (Ind. 2016). Included in that duty is the duty to warn. *Perdue v. Greater Lafayette Health Servs.*, 951 N.E.2d 235, 240 (Ind. Ct. App. 2011), *trans. denied*. It is a duty that does not cease at any time while the invitee is on the property. *Get-N-Go, Inc. v. Markins*, 550 N.E.2d 748, 751 (Ind. 1990). The landowner's duty and the duty to warn derive from his superior knowledge. *Douglass v. Irvin*, 549 N.E.2d 368, 371 (Ind. 1990); *Carter v. AMOCO*, 139 F.3d 1158, 1164 (7th Cir. 1998) (Indiana law) ("A duty to warn is

---

4   Butner concedes that he was the landowner and Webber was an invitee. [ECF 34 at 11].

predicated upon the understanding that individuals who have superior knowledge of the dangers posed by a hazard must warn those who lack similar knowledge.").

That duty required Butner to pass along the Moore's Warning to Webber. By failing to pass along Moore's Warning, Butner breached that duty. Had Butner done so, Webber would never have tried to cut down those trees and would not have suffered devastating, life-altering injuries. [Exh. E at ¶ 6].[5]

### b.   The Danger to Webber Was Not Known and Obvious Because Butner Deprived Webber of Important Information to Evaluate the Risk.

Butner argues that no claim can lie in premises liability because the danger was known and obvious to Webber. [ECF 34 at 11]. Whether a danger is known and obvious is a question of fact for a jury. *See, e.g.*, *Nagel v. N. Ind. Pub. Serv. Co.*, 26 N.E.3d 30, 47 (Ind. Ct. App. 2015), *trans. denied*. Under Indiana law, the duty of a landowner to his invitee does not cease because the invitee is aware of a danger. *Get-N-Go*, 550 N.E.2d at 751. The invitee's knowledge or obviousness of the condition is a matter for determining whether a breach has occurred and assessing fault. *Id.* Summary judgment is not appropriate for resolving questions whether a landowner has exercised reasonable care or an invitee's comparative fault. *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, No. 1:02-cv-1014-LJM-VSS, 2006 U.S. Dist. LEXIS 72566, at *12, 2006 WL 2859425 (S.D. Ind. Oct. 4, 2006) (McKinney, C.J.); *Jordan v. Meijer Stores L.P.*, No. 1:10-cv-0368-TWP-TAB, 2012 U.S. Dist. LEXIS 147047, at *7, 2012 WL 4867422 (S.D. Ind. Oct. 12, 2012) (Pratt, J.).

---

[5]   Although Webber has provided actual testimony that the warning would have altered his conduct, Indiana law does not require a plaintiff to testify that it would have. *Sandberg Trucking, Inc. v. Johnson*, –N.E.3d–, No. 79A04-1605-CT-1069, 2017 Ind. App. LEXIS 200, at *17–18 (Ind. Ct. App. May 11, 2017). Indeed, in the similar context of products liability, Indiana attaches a presumption that the warning would have been heeded if provided. *Kovach v. Midwest*, 913 N.E.2d 193, 199 (Ind. 2009).

Even if knowledge and obviousness could be adjudicated on summary judgment, the full danger was not known and obvious to Webber. As the Indiana Supreme Court recognized in applying the open and obvious danger rule in the context of products liability, "[t]he question turns on how broadly one construes the word 'danger' in the 'open and obvious *danger* rule.'" *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 285 (Ind. 1983) (emphasis in original).[6] The same concept applies to premises liability.

> The word "known" denotes not only knowledge of the existence of the condition or activity itself, but also appreciation of the danger it involves. Thus the condition or activity must not only be known to exist, *but it must also be recognized that it is dangerous, and the probability and gravity of the threatened harm must be appreciated*. "Obvious" means that *both the condition and the risk are apparent* to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.

RESTATEMENT (SECOND) OF TORTS § 343A cmt. b (emphasis added); *see also Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 20 (Ind. Ct. App. 2015) (applying comment b). Webber needed to be fully aware of the gravity of the danger posed.

Here, the danger was clear to Moore, a professional with more than two decades of experience. That is why Moore told Butner to have a professional such as Moore or Shelton cut down the trees. Instead, Butner stood silent and allowed Webber to enter the property without passing along Moore's Warning. The evidence shows that Webber did not appreciate the risk because had he been told that Moore had warned that it was too dangerous, Webber would not have gone out there. In his deposition, when asked about whether Webber was experienced at cutting down trees, Moore answered, "I would say no. I mean, really it's – it's a -- I mean, people don't realize how dangerous it is." [Exh. B at 28:11-21]. Both Moore and Webber make

---

[6] Notably, the issue here is degree of the *risk*, not to be confused with degree of *injury*. Compare, *Anderson v. P.A. Radocy & Sons*, 865 F. Supp. 522, 528 (N.D. Ind. 1994), *with Anderson v. P.A. Radocy & Sons*, 67 F.3d 619, 624 (7th Cir. 1995).

clear, Webber did not fully appreciate the risk, rendering his engagement with the danger neither knowing nor obvious.

Butner, in contending that the dangerous condition of his property was open and obvious, argues that the "comparative knowledge" about the danger should be taken into consideration. [ECF 34 at 12] (citations omitted). Butner is correct in that point, but wrong in application. He inaccurately contends that he "did not have knowledge of any danger that Mr. Webber did not possess." [*Id*.]. That is patently incorrect. Butner knew that Moore, a man with more than two decades of experience, [Exh. B at 5:16–7], had told him the trees were very dangerous and that he should have a professional cut them down. [*Id*. at 22:15–23:17, 29:5-9 & 50:5-24]. Assessing the "comparative knowledge" makes clear that Butner, not Webber, knew more about the danger involved, because an expert in the dangers told him that the trees were abnormally dangerous. Webber did not know that Moore had warned Butner. [Exh. E ¶ 6]. Had Webber known about Moore's Warning, he would not have risked cutting down the trees. [*Id*.].

### c.  Even If the Danger Were Known or Obvious to Webber, Butner is Still Liable Because He Should Have Anticipated the Danger Would Cause Harm to Webber.

As a general rule, a landowner is not liable to those injured upon his property as a result of dangers known and appreciated by the invitee. RESTATEMENT (SECOND) TORTS § 343A(1). That general rule, however, has an exception that applies here: a landowner is liable if he should anticipate the harm anyway. *Id*. "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness*." *Id*. (emphasis added).

8

The injury to Webber is precisely the scenario in which the landowner, Butner, should have anticipated the harm anyway, because the professional, Moore, told Butner that the trees should be handled by professionals, which Webber was not.

As explained by Professors Prosser and Keeton:

> [I]n the usual case, there is no obligation to protect the invitee against dangers which are known to him, or which are so obvious and apparent that he may reasonably be expected to discover them. Against such condition it may normally be expected that the visitor will protect himself. It is for this reason that it is sometimes held that reasonable care requires nothing more than a warning of the danger. But this is certainly not a fixed rule, and all of the circumstances must be taken into account. In any case where the occupier as a reasonable person should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required.[7] . . . In some jurisdictions, it is also true where the condition is one, such as icy steps, which cannot be negotiated with reasonable safety even though the invitee is fully aware of it, when, because the premises are held open to him for his use, it is to be expected that he will nevertheless proceed to encounter it.[8] The jury in such cases may be permitted to find that obviousness, warning or even knowledge is not enough.

W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 61 at 427–28 (5th ed. 1984) (further citations omitted); *see also Broadhurst v. Davis*, 146 Ind. App. 329, 331, 255 N.E.2d 544, 546 (1970) (quoting and adopting passage).

Similarly, Comment f to the Restatement (Second) of Torts § 343A, states:

> There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

---

[7]   For this proposition, the authors cite RESTATEMENT (SECOND) OF TORTS § 343A cmt. f (1964).

[8]   For this proposition, the authors cite, *inter alia*, *Hammond v. Allegretti*, 262 Ind. 82, 311 N.E.2d 821 (1974).

*Id.* (emphasis added; internal citations omitted); *see also Ooms v. USX Corp.*, 661 N.E.2d 1250, 1254–55 (Ind. Ct. App. 1996) (applying Comment f), *trans. denied*.

If merely holding a business open is sufficient to invite a person to cross icy steps such that the open-and-obvious-danger defense does not apply, then certainly explicitly asking a friend onto your property to cut down dead trees is sufficient to foreclose the open-and-obvious-danger defense here. Butner absolutely could and should have anticipated the dangerous condition would cause physical harm to Webber, because a professional in the timber industry told him it would.

As Comment f recognizes, the duty required Butner to at least pass along Moore's Warning to Webber. Indeed, Comment f recognizes that the landowner may be required "to take other reasonable steps to protect" an invitee as well. Under these facts, other reasonable steps would mean following Moore's advice: do not let a non-professional, such as Webber, take down the trees. At the very least, however, Butner was required to pass along Moore's Warning.

Because Moore had told Butner that the trees were too dangerous to allow anyone other than professionals to cut them down and Butner brought Webber, a non-professional, on to his land do to just that, the harm to Webber was anticipatable regardless of whether the danger was known or obvious. By sending Webber out to cut the trees without so much as telling him of Moore's Warning, Butner breached that duty. Had Butner simply told Webber of Moore's Warning, Webber would not be a shell of the man he once was.

## 2. As a Fellow Worker in Cutting Down the Trees, Butner Had a Duty to Pass Along Moore's Warning.

Indiana law has long recognized that a worker "has a duty to use ordinary care both in its work and in the course of performance of the work." *Guy's Concrete, Inc. v. Crawford*, 793 N.E.2d 288, 294–95 (Ind. Ct. App. 2003) (citations omitted); *see also Peters v. Forster*, 804

N.E.2d 736, 743 (Ind. 2004) (same); *Blake v. Calumet Const. Corp.*, 674 N.E.2d 167, 170 (Ind. 1996).[9] That duty extends to fellow workers on a project. *Id*. Ordinary care under the circumstances does not allow Butner to have stood silently by, allowing his fellow worker, Webber, to encounter a danger that Butner knew existed but did not warn Webber about.

> **3.     Even If Indiana Law Had Not Already Recognized a Duty for Butner to Pass Along Moore's Warning to Webber, the *Webb v. Jarvis* Analysis Mandates Such a Duty**

Confronted with the difficult question of when to create a duty that the law has not previously addressed, the Indiana Supreme Court set forth a three-factor analysis to determine whether the law will recognize a duty. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). The *Webb v. Jarvis* analysis requires the court to balance "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Id*. "Courts will generally find a duty where reasonable persons would recognize and agree that a duty exists." *Guy's Concrete, Inc. v. Crawford*, 793 N.E.2d 288, 293 (Ind. Ct. App. 2003).

The present scenario easily satisfies the first two elements, as the relationship between Butner and Webber is the kind recognized in numerous contexts to merit imposing a duty, and the harm to Webber was entirely foreseeable as the result of not forwarding Moore's Warning. It also meets the third element. Indiana public policy, as recognized by the Indiana Supreme Court, requires a party with superior knowledge to not stand silent and allow another with whom it has a relationship to be injured when the warning could have prevented the harm. Having satisfied each of the *Webb v. Jarvis* elements, Butner had a duty to pass along Moore's Warning to Webber before Webber engaged in the exact, dangerous activity Moore had warned against.

---

[9]   Because the Indiana Workers Compensation Act's exclusive remedy provision extends to co-employees, *Wine-Settergren v. Lamey*, 716 N.E.2d 381, 384 (Ind. 1999), the Indiana cases addressing the duty of worksite safety invariably address independent contractors. However, that does not alter the analysis among co-laborers in general. In jurisdictions permitting suit among co-employees, courts acknowledge the common law duty of reasonable care among co-workers. *See, e.g.*, *Workman v. Vader*, 854 S.W.2d 560, 563 (Mo. Ct. App. 1993).

a. **The Relationship Between Butner and Webber, As Landowner-Invitee, Host-Social Guest, or Companions and a Social Venture is the Type Generally Recognized to Merit Extension of a Duty.**

The relationship of the parties was that of landowner-invitee. As Indiana law already recognizes, the duty of a landowner to his invited guest is "the highest duty of care . . . that duty being to exercise reasonable care for the invitee's protection while she is on the premises." *Rider v. McCamment*, 938 N.E.2d 262, 267 (Ind. Ct. App. 2010). Even if not viewed from the general framework of landowner-invitee, the relationship between Butner and Webber in this context is a "special relationship" that creates duties between the parties that exceed those owed to mere strangers.

As a general proposition of common law, there is no duty to rescue another absent a "special relationship." *Jackson v. Joliet*, 715 F.2d 1200, 1202 (7th Cir. 1983); *Henshilwood v. Hendricks Cnty.*, 653 N.E.2d 1062, 1068 (Ind. Ct. App. 1995), *trans. denied*. The relationship between Butner and Webber is sufficiently close so as to impose on Butner a duty to rescue Webber. First, Butner, as a host, owed a duty to rescue Webber, as his social guest. PROSSER AND KEETON ON TORTS § 56 at 376 (citing *inter alia Tubbs v. Argus*, 140 Ind. App. 695, 225 N.E.2d 841 (1967), *trans. denied*); *see also Rogers*, 63 N.E.3d at 327. Second, as companions in a social venture–i.e. helping a friend cut down trees–Butner had such a special relationship with Webber. 2A STUART M. SPEISER ET AL., THE AMERICAN LAW OF TORTS § 9:23 (2009) ("Such a special relationship has been held to exist between companions engaged in a social venture."). In each instance, Butner had a common law special relationship to Webber mandating a duty to render Webber aid.[10]

---

[10]   The aforementioned duty of a landowner to persons on his property is even broader than the duty to rescue and does not require a special relationship between the parties. *See generally* Shanda K. Pearson, *Justice in a*

Thus, whether it be as landowner-invitee, social guest, or companions on a social venture, the relationship between Butner and Webber is one that the law already dictates is of a nature meriting a duty by Butner to Webber.

**b.      Butner Could Absolutely Foresee the Harm to Webber Because It Was the Harm Moore Warned Butner About.**

The Court of Appeals of Indiana outlined the analysis for the foreseeability prong of *Webb v. Jarvis* in the context of summary judgment:

> In analyzing the foreseeability factor of duty, we focus on whether the injured person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991). Such foreseeability does not mean that the precise hazard or exact consequences should have been foreseen, but neither does it encompass anything which might occur. Here, as the moving party, the School District has the burden of demonstrating that, as a matter of law, Phelps's assault on C.J. was not foreseeable.

*M.S.D. of Martinsville v. Jackson*, 9 N.E.3d 230, 244 (Ind. Ct. App. 2014) (further citations omitted), *trans. denied*.

As discussed above, the type of harm that befell Webber was foreseeable from Butner's vantage point. The type of harm–falling dead limbs–is exactly why Moore warned Butner that the trees were very dangerous and should be handled by professionals. [Exh. B at 23:14–17].

**c.      The Indiana Supreme Court Has Recognized that Indiana's Public Policy Favors a Duty on a Party with Superior Knowledge to Pass that Superior Knowledge to Persons Who May Suffer Harm Without It.**

The last factor to consider under *Webb v. Jarvis* is public policy concerns. The public policy of Indiana could scarcely be clearer. As the Indiana Supreme Court recognized in *Douglass v. Irvin*, the underlying policy in support of imposing a duty on a landowner for the

---

*Changed World: Lack of Special Relationships Not Special Enough to Relieve Landowners from Duty in Premises Liability Actions – Louis v. Louis*, 29 Wm. Mitchell L. Rev. 1029 (2003).

care of his invitee is because the landowner is in a position of superior knowledge to the outsider–i.e. the invitee. 549 N.E.2d at 371. That is precisely the issue presented here. Butner was given specific information from a professional in the timber industry that the trees were very dangerous and should be taken down by a professional. Butner, instead, brought in a non-professional friend to remove the trees without passing on that vital piece of information, which, if it had been relayed, would have prevented the catastrophe from ever occurring.

In *Osborn v. The Adams Brick Co.*, the Indiana Appellate Court emphasized the state's strong preference for ensuring that a person conducting dangerous work is given full warning of the dangers known to the persons who put the worker in the dangerous environment:

> On this state of facts, Did appellee owe appellant any duty when it placed him in the position of "shooter"? This question must be answered in the affirmative, and the fact that he was called from one kind of work to another, requiring different knowledge and more skill and experience, under all the authorities, instead of relieving appellee from responsibility, only emphasizes its duty, enjoined by the law, to warn appellant of known dangers and of those it might ascertain by reasonable care and inspection. But here appellee is shown to have received positive information that the pit was dangerous, and also knew appellant was a common laborer, that he did not know the peculiar dangers of the pit, and did not possess the skill and experience that would enable him to ascertain such dangers for himself. This makes appellee's failure to warn inexcusable.

52 Ind. App. 175, 186–87, 99 N.E. 530, 535 (1912).

Each of the three factors strongly favors a finding of a duty under *Webb v. Jarvis*. Indiana law certainly requires a landowner who has received a safety warning from a professional to pass that warning along to a person who the landowner has engaged to act contrary to that warning. Indeed, reasonable Hoosiers would recognize and agree that a landowner cannot stand silently by and let a non-professional engage in a dangerous activity that a professional had told the landowner not to allow a non-professional do without, at the very least, letting the non-professional know of the warning. That is precisely what Butner did here. He was warned by

14

Moore and not only acted contrary to that warning but failed to let Webber know that Moore had warned against doing exactly what they did.

> **B.    Because Butner Should Have Anticipated the Injury to Webber, Due to the Warning Butner Had Received from Moore, Butner Had a Duty to Refrain from Exposing Webber to the Harm.**

Even aside from merely passing along Moore's Warning to Webber, the danger posed to Webber was of sufficient gravity that Butner had a duty to not expose Webber to the condition in the first place. As discussed above, the Restatement (Second) of Torts § 343A(1), which has been adopted in Indiana, recognizes that a landowner is liable for injuries to an invitee if the landowner "should anticipate the harm despite" the invitee's knowledge or the obviousness of a danger. *Douglass*, 549 N.E.2d at 370–71; *accord Nagel*, 26 N.E.3d at 46–47 ("[E]ven if a landowner is not negligent for failing to warn an invitee of a dangerous condition, it still may be negligent for failing to take reasonable precautionary measures to reduce the danger."). As comment f to Section 343A makes clear, the landowner's duty to protect the invitee "may require him to warn the invitee, ***or to take other reasonable steps to protect him, against the known or obvious condition or activity***, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm." (emphasis added). This is a case in which other reasonable steps–i.e. not bringing Webber to the property to cut the trees–were certainly required.

Although Indiana has adopted the view expressed in Section 343A and by Professors Prosser and Keeton, Indiana cases have rarely had opportunity to identify circumstances in which a landowner is held to anticipate harm. The closest examples are probably *Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 24 (Ind. Ct. App. 2015) (question for jury whether hotel should have anticipated guest would cross icy sidewalk despite obvious danger); *Smith v. Baxter*, 796 N.E.2d

15

242 (Ind. 2003) (affirming verdict for invitee because ladder on grain bin was known danger to landowner).[11]

More similar to this case is a decision from the Massachusetts Supreme Judicial Court. In *Dos Santos v. Coleta*, 987 N.E.2d 1187 (Mass. 2013), the court held that a jury should have been provided an instruction mirroring Section 343A where an invitee was injured by trying to flip from a trampoline into an adjacent inflatable pool, each set up by the landowner:

> First, as previously discussed, application of § 343A is not limited to situations where the plaintiff chooses to encounter the danger only after conducting a favorable "cost-benefit" analysis.[12] A plaintiff's own negligence in encountering the danger does not relieve the landowner of a duty to remedy that danger where the plaintiff's negligent act can and should be anticipated by the landowner. Second, as the defendants' own testimony made quite clear, Jose set up the trampoline next to the pool with the specific intent to enable the type of use that resulted in the plaintiff's injury, and both defendants knew that the trampoline and pool were in fact being used in this manner and that this use was dangerous. Therefore, it is simply incorrect to say the defendants did not anticipate the risk of injury.
>
> * * * * *
>
> "While the open and obvious doctrine may relieve the defendant of its duty to warn, the doctrine does not mean that the defendant can maintain its property 'in an unreasonably unsafe condition as long as the unsafe condition is open and obvious.'" Here, Jose set up a trampoline immediately adjacent to a two-foot-deep pool, with a ladder leading directly from the pool to the trampoline, for the very purpose of enabling people to jump from the trampoline into the pool. He knew that the pool warned against jumping of any kind, and he knew that the setup was dangerous but proceeded with the setup because he thought it would be "fun." In many ways, Jose's actions were equivalent to installing a diving board in the shallow end of an in-ground pool. The danger from using a diving board in the shallow end of an in-ground pool would be open and obvious, but a defendant who installs or maintains the diving board in this manner would surely have

---

[11] Comment f to the Restatement provides an illustrative, but not exhaustive list of examples. *Dos Santos v. Coleta*, 987 N.E.2d 1187, 1193 (Mass. 2013) ("The illustrations accompanying § 343A comment f are clearly meant to be illustrative, not exhaustive."); John H. Marks, *The Limit to Premises Liability for Harms Caused by "Known or Obvious" Dangers: Will It Trip and Fall Over the Duty-Breach Framework Emerging in the Restatement (Third) of Torts?*, 38 Tex. Tech L. Rev. 1, 36 (2005) ("[T]he Second Restatement apparently contemplates an open-ended range of articulable circumstances capable of producing foreseeable harm even when invitees know of the danger or it is obvious.").

[12] This is a point echoed in Indiana law. *Smith v. Baxter*, 796 N.E.2d 242, 245 (Ind. 2003) ("There is no requirement under [Restatement sections 343 and 343A] that an invitee's conduct be undertaken for compelling circumstances.").

reason to anticipate that persons would use the board to propel themselves into the water despite the danger. Far from failing to warn users not to jump or dive into the shallow pool–which, standing alone, would not give rise to liability–Jose actively facilitated this improper and highly dangerous use. And while the defendants make much of the fact that the plaintiff attempted a front flip (or, as they variously suggest, a dive) into the pool, whereas Jose only intended for people to "jump" from the trampoline to the pool, this assertion misses the point. Even assuming the jury interpreted the defendants' testimony that the setup was intended to facilitate "jumping" to mean that the defendants did not anticipate anyone would attempt to flip or dive into the pool, "[t]o be held liable the defendant need not have foreseen the precise manner in which the injuries occurred." Given the shallow depth of the water, there was no reliably safe way to propel oneself from the trampoline into the pool. The defendants knew that it was unsafe to do so and, therefore, could or should have anticipated injuries resulting from this activity.

*Id*. at 1195 & 1197–98 (footnotes and citations omitted).

Like *Dos Santos*, Butner disregarded a clear warning–Moore's Warning–and created a circumstance in which he invited Webber to do the exact thing that Moore warned not to do. Both there and here, it is a case in which the landowner knew the dangers facing the invitee better than the invitee himself and, nevertheless, welcomed and encouraged the invitee to encounter those dangers. As the landowner, Butner had the power to remedy the dangerous condition by not bringing Webber onto the property in the first place. *See* PROSSER AND KEETON ON TORTS § 61 at 428 (recognizing "possessor must exercise the power of control or expulsion which his occupation of the premises gives him" to protect visitors). He cannot now claim that he owed no duty, when he brought Webber to the danger.

### C.   Causation is a Contested Issue of Fact and the Khan Affidavit Does Not Establish Causation as a Matter of Law and Otherwise Fails the Rule 702 Requirements.

Irrespective of Butner's duty to pass along Moore's Warning, Butner assumed a duty to keep a lookout for falling branches. Apparently conceding that there is at least a dispute of

17

material facts as to whether Butner assumed the duty to lookout, Butner contends simply that even had he performed that function it would not have changed the outcome.[13]

Butner's argument is entirely based on the testimony–by way of affidavit[14]–of Farheen S. Khan, Ph.D. Khan's "expert" opinion, however, wholly fails to satisfy the requirements of Federal Rule of Evidence 702. Consequently, the affidavit fails to meet the standard of Federal Rule of Civil Procedure 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").[15]

As Judge Springmann for the Northern District of Indiana recently summarized:

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579[ ](1993). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that

---

[13] In his short discussion on causation, Butner claims that he "did not breach [his] duty or proximately cause [Webber]'s injuries as it was not possible for Mr. Butner to have warned Mr. Webber that a branch had broken off and posed an imminent and potentially life threatening danger." [ECF 34 at 13]. Although the argument appears to suggest that it addresses proximate cause, nothing in the discussion addresses whether Webber's injury was "'a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated.'" *Dameron v. City of Scottsburg*, 36 F. Supp. 2d 821, 835 (S.D. Ind. 1998) (Hamilton, J.) (citation omitted). Instead, the focus is clearly only on cause in fact. But, to the extent that the Court believes proximate cause is properly at issue, "proximate cause is [generally] a question of fact for the jury's determination." *Id.* at 836; *Geisner v. G4S Secure Sols. (USA) Inc.*, No. 1:12-cv-00401-TWP-DKL, 2013 U.S. Dist. LEXIS 128021, at *6, 2013 WL 4804549 (S.D. Ind. Sep. 9, 2013) (Pratt, J.).

[14] Butner has not designated an expert report in support of Khan's opinion. Instead, Butner has submitted a remarkably short and conclusory affidavit by Khan. [ECF 33 & 34-3].

[15] Although discussed above, it merits repeating here, "As Indiana courts repeatedly have cautioned, 'A negligence action is rarely an appropriate case for disposal by summary judgment because issues of negligence, causation, and reasonable care are most appropriately left for a determination of the trier of fact.'" *Briesacher v. AMG Res., Inc.*, No. 2:03 cv 331, 2005 U.S. Dist. LEXIS 46045, at *23–24, 2005 WL 5988645 (N.D. Ind. Dec. 16, 2005) (citations and further quotation marks omitted).

characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." Whether to admit expert testimony rests within the discretion of the district court. "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."

*Costanza v. Vulcan Ladder Co.*, No. 1:13-CV-260-TLS, 2016 U.S. Dist. LEXIS 167470, at *7–8 (Dec. 5, 2016) (further citations omitted). Failure to sustain its Rule 702 burden at the summary judgment stage will result in the striking of an expert's affidavit under Rule 56(c)(4). *See, e.g.*, *B. F. v. Buckle, Inc.*, No. 3:13-cv-00222-RLY-WGH, 2015 U.S. Dist. LEXIS 160510, at *3–4, 2015 WL 7758529 (S.D. Ind. Dec. 1, 2015) (Young, C.J.); *Thermapure, Inc. v. RxHeat, LLC*, 35 F. Supp. 3d 968, 980–84 (N.D. Ill. 2014).

The entirety of Khan's opinion is provided in two paragraphs of her Affidavit:

> 5.  It is my opinion, based on all available information, that the height of the tree was between 40-50 feet, assuming that the subject branch was located below full height, between 30-45 feet, it would take the branch between 1.4 - 1.7 seconds to free fall to the ground. It is my opinion that even if Mr. Butner were looking up at the tree, knowing both form (branch) and location (subject tree) of expected stimulus, in the best case scenario if he was looking at the location where a branch was falling from, it would take Mr. Butner a minimum of 0.25 seconds to detect a falling branch. Once detected, Mr. Butner would have to identify the stimulus (i.e., a falling branch), determine its location of fall (determine whether it was falling on him or Mr. Webber), decide how to respond (determine what needed to be done), and initiate the chosen response (shout out a warning, step out of the way, or push Mr. Webber away), which would increase the total perception response time.
>
> [6].  It is my opinion that even if Mr. Butner was looking toward the tree, he would not have had sufficient time to prevent the incident from occurring in the 1.7 seconds window between the branch falling and striking Mr. Webber, assuming the branch was falling from a height of 45 feet.

[ECF 34-3 at ¶¶ 5 & 7].

Without even looking further than the affidavit, a few obvious flaws appear: (1) there is no explanation why the branch should be assumed to have fallen from 45 feet instead of 50 feet;

(2) there is no explanation of the calculation aside from a free fall taking 1.7 seconds and Butner

taking 0.25 seconds to detect it–0.25 is, of course, less than 1.7; and (3) there is no explanation

of why the opinion assumes the branch was in free fall, as opposed to, for example, breaking off

of the trunk gradually or hitting other branches on its way down, thereby increasing the time it

took to fall. That alone is sufficient to prevent summary judgment. *Nat'l Diamond Syndicate,

Inc. v. United Parcel Serv., Inc.*, 897 F.2d 253, 260 (7th Cir. 1990) ("Summary judgment is not

appropriate, however, if the uncontroverted affidavit itself fails to meet the standards of Rule

56(e). . . . [I]f the affiant offers an expert opinion, she must give *reasons* for the opinion, and not

merely state her conclusions.").

Stepping back from the Affidavit, however, shows that the flaws are astonishing, to the

point that not only does the opinion fail to carry the burden on summary judgment, it fails to

establish sufficient reliability for admission of expert testimony under Rule 702.

First, the evidence in this case is not that the tree was 40 to 50 feet high. Khan parrots this

assertion and Butner claims it in his brief, but Butner's citation shows the statement is wrong.

The reference to 40 to 50 feet was the size of the trees that Webber had cut down *before* the tree

that injured him. The deposition transcript clearly states:

> Q.  Now, for those six to eight trees you already felled [before cutting the subject
>     tree], how did you cut them down?
> A.  How did I cut them down?
> Q.  Yes.
> A.  With a saw.
> Q.  And were you just -- a straight cut, what kind of method were you using to cut
>     it down?
> A.  They're small. They're only about that big (indicating). Cut them right off.
> Q.  That big, how big is that in inches, do you know?
> A.  Probably 13 or 14 inches.
> Q.  Do you know how tall these trees are?
> A.  **Approximately probably 40 or 50 feet**.
> Q.  Of those six to eight trees, were most of those bigger than the tree?
> A.  No.

20

Q.  They were smaller trees?
A.  Yes.
Q.  **So the tree where you got injured on, was that the largest tree you cut?**
A.  **It was the biggest one I saw**.

[ECF 34-2 at 40:22–41:17 (emphasis added)].

The evidence of the actual tree at issue was provided in Butner's sworn answers to interrogatories, in which he stated, "Average height of all felled trees 50'-70', 19"-22" in diameter, 5-7 trees were felled." [Exh. D at Ans. 7]. Given that the tree that injured Webber was the tallest of the trees felled by him, that would make it 70' tall according to Butner's sworn interrogatory answers, which Dr. Kahn failed to consider.

Turning to Khan's deposition, she explains why she chose 45 feet. It is because "Webber testified that the tree was about 40 to 50 feet tall"–which was not his testimony–and because "I basically thought about typically how trees, walnut trees, look like and determined that the branch would not be – if the height of the tree was 50, it wouldn't be at 50 feet. It would be somewhere below that." [Exh. G at 63:1-7 & 65:13–66:1]. Khan has degrees in industrial engineering and human factors, with no expertise in trees. [*Id.* at 10:8-24]. Looking at the top of the tree, [Exh. H],[16] it looks entirely possible that the branch, [Exh. I], could have come from there. Though, of course, that is ultimately for a jury to decide. Butner has already testified that he does not know where the branch came from. [Exh. A at 45:10-12].

Khan calculated the time it would take to fall "us[ing] simple physics equations." [Exh. G at 66:6-23 & 81:24–82:13]. That equation, which is familiar to anyone who has completed high school physics, is that Distance = ½ x (gravity) x (time)$^2$. [*Id.*]. Using that equation, the time to free fall 45 feet is, as Khan states, 1.7s. At 70 feet, however, it is 2.1s. But, as Khan admits, those calculations are the maximum possible fall rate, because it assumes free fall. [*Id.* at 67:6-22]. But

---

[16]   The rest of the tree was harvested by Shelton but he cut off and left the top. [Exh. C at 20:10–21:15].

there is no evidence to support that assumption. The branch could easily have hit an obstruction

on its way down or may not have broken from the trunk cleanly and immediately. Khan

eventually admitted as much during her deposition and, accordingly had to confess she had no

idea how long it took the branch to fall:

> Q.  It eventually fell, and we have no idea how long it took to fall, do we?
> A.  That's true.
>
> * * * * *
>
> Q.  Okay. But just to be very clear, you don't actually know how long it took to
>      fall because you don't know if it fell unimpeded?
> A.  Yes.
>
> * * * * *
>
> Q.  We also don't know if the branch became detached immediately and began to
>      fall or if it cracked and hung and fell or if there were signs prior to it falling
>      that it was going to fall, do we?
> A.  We don't.
> Q.  Okay. So what you have described is a branch, if you held it in space with no
>      obstructions, and dropped it immediately, right?
> A.  Yes.
> Q.  Okay. And you have no idea if that's what happened, do you?
> A.  Yes, and we have no idea that it didn't happen, true.
> Q.  Okay. That's right, and that's what juries do, right?
>      They decide based on the circumstances what happened, don't they?
> A.  Right, right.

[*Id*. at 77:23–78:1, 80:1-4 & 80:23–81:17]; *see also* [*Id*. at 71:15–73:19]; *see*, *e.g.*, [Exh. C at

33:17-18 (Shelton: "I have had [branches] fall, hit another tree and fall and almost hit me.")];

[Exh. H]. It also could have broken partially away from the tree instead of a clean break. [Exh.

I]. Or the branch could have shown visible evidence of breaking away long before it actually fell,

breaking off gradually. But Butner was not keeping a look out, so we do not know. [Exh. G at

73:20–76:6]. However, a jury could infer any of these possibilities from the surrounding

circumstances; and, for summary judgment purposes, Webber is certainly entitled to such

inferences.

But that is not the end of Khan's errors. She bases her opinion in part on the mistaken belief that the full extent of Webber's request for lookout was Webber telling Butner to "watch my back" three times, which Kahn characterizes as vague. [*Id*. at 89:8-13]; *see also* [*Id*. at 88:14-20, 110:10-16 & 144:20–145:14]. But that was not Webber's testimony. In fact, Webber testified that he clearly and explicitly explained the danger that he wanted Butner to watch for and why: "I told him the first time that I would cut his trees, 'You have to watch out for me because there's going to be two of us there, and I cannot look at that tree on the top of it while I'm sawing. I can't move up there, you've got to watch for me.'") & 32:2-10 ("I said, 'They'll be two of us.' And I said, 'You will have to watch out for my back. I cannot look up that tree and see some of them coming down on me when you're sitting there doing nothing.'")]. Kahn completely ignored this crucial testimony in reaching her opinions.

Although those failings show that Khan's opinion does not meet the sufficient facts or data obligation of Rule 702(b), the biggest failing of all is that Khan's opinion does not provide a methodology as required by Rule 702(c). Khan concludes that, if it took the branch 1.7 seconds to fall (which, as set forth above is not a reasonable assumption supported by the evidence or sound methodology), Butner "would not have had sufficient time to prevent the incident from occurring … ." [ECF 34-3 at ¶ 7]. One would expect that, in order to reach this conclusion, she would use her "human factors" expertise and scientific studies to actually calculate and quantify the amount of it would have taken Butner to detect the danger and get Webber out of the way. That assumption would be wrong.

Instead, the only figure she cites in her report or affidavit supporting this conclusory opinion is the 0.25s it purportedly would have taken Butner to detect a falling branch. [Exh. G-

3]. She then concludes that the laundry list of other steps would exceed 1.7s. Yet she makes absolutely no effort to quantify *any* of those other steps.

> Q. So let me just ask this question as straight forwardly as I can.
>    As you sit here today, is it correct that you have no idea how long it would have taken for Mr. Butner to take some action to prevent Mr. Webber from getting hit by this branch?
> A. I'm going to say that it's more than 1.7 seconds.
>                         * * * * *
> Q. Do you know how long it would have taken? Can you assign a number to how long it would have taken?
> A. It is going to be taking longer than 1.7 seconds.
> Q. Okay. And beyond that, you don't know how much time?
> A. I don't know how much time.
> Q. And you can't quantify it?
> A. I don't know.

[Exh. G at 121:21–122:5 & 122:22–123:7]. This is not a scientific opinion. It is at most the gut instinct of a biased individual who happens to have a Ph.D. that it would take longer than 1.7 seconds to avoid this danger.

But even if she had quantified those steps, she still shows fundamental misunderstanding of how people react when cutting trees. Khan utterly refused to consider that Webber, who had told Butner to look out for falling branches, would have any clue what to do in case a branch fell. When pressed on the issue, her calculation not only did not change, she fought the concept entirely. [*Id.* at 143:16–148:4]. But Moore and Shelton, each with actual experience logging, explained that you always go in with escape paths. [Exh. B at 48:2-10; Exh. C at 10:21-11:4]. They also, contrary to what Khan would have us believe, have actually been able to get out of the way of falling branches while cutting trees when a spotter recognized a falling branch and get them out of the way. [Exh. B 48:2–49:13; Exh. C 10:14-20].

Khan's opinion runs into the same problems identified by Judge Friot of the Western District of Oklahoma:

24

> Although human factors engineering is a legitimate discipline, in a forensic
> setting, the application of human factors principles can be highly subjective and
> thus conveniently malleable. Human factors testimony which is proffered without
> a showing of objective support (testing or, at least, independent support in
> relevant literature) invites close scrutiny to determine whether the expert's work
> is an exercise in facile advocacy (*e.g.* the "ipse dixit of the expert").[17] Mr. Syson's
> proposed expert testimony fails the test. This conclusion is entirely consonant
> with our circuit's treatment of Daubert challenges in similar contexts. *E.g.,* Milne
> v. USA Cycling, 575 F.3d. 1120, 1134 (10th Cir. 2009) (opinions not supported
> by "empirical or quantitative studies"); United States v. Rodriguez-Felix, 450
> F.3d 1117, 1126 (10th Cir. 2006), *cert. denied,* 549 U.S. 968, 127 S. Ct. 420, 166
> L. Ed. 2d 297 (2006)(Daubert not satisfied by casual mention of a few scientific
> studies which fail to demonstrate that an expert's conclusions are grounded in
> established research, recognized in the scientific community, or otherwise
> accepted as scientific knowledge); Black v. M&W Gear Co., 269 F.3d 1220, 1237
> (10th Cir. 2001) (expert "had not conducted any tests or calculations to support
> his opinion").

*Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1103 (W.D. Okla. 2009). All Khan has

done here is take a formula that any high school physics student could use, add to it a study that

says 0.25s, and then conveniently fill in the rest in a way that favors her client, cannot be

quantified, and cannot make any accommodations for any variables.[18] That is not an expert who

can help a jury; that is a "hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir.

1996) ("[T]he district court must ensure that it is dealing with an expert, not just a hired gun.").[19]

---

[17]   Khan's bias is easily seen in conclusions 3 & 6 of her report. [Exh. G-3]. With no analysis, Khan decides that the danger was open and obvious. [*Id.* at 5]. Similarly, she concludes that the cause of the injury was "Webber's failure to utilize the information from his environment and experience, and his failure to act in a self-protective manner by not utilizing personal protective equipment when cutting the subject tree." [*Id.* at 6]. Again, there is no analysis, just a convenient opinion that works as a sound bite for her client. Butner opted not to rely on those opinions in his Motion, but Khan's bias clothed in expertise is readily apparent.

[18]   It should be noted that much of Kahn's testimony was struck in January by a Florida trial court, which found portions of her testimony were nothing more than "pure opinion," which could not meet the rigors of the *Daubert* analysis. [Exh. J].

[19]   It merits note that in the two-dozen times in which Khan had testified prior to her deposition in this case, she has only once testified for a plaintiff. [Exh. G-2; Exh. G at 14:20–16:18]. The single time she testified for a plaintiff was her first time testifying (November 19, 2009) and nearly three years before the next time she testified (October 16, 2012). Since then, she has testified exclusively for the defense. [*Id.*].

IV.     **Conclusion**

For these reasons, the Affidavit of Farheen S. Khan, [ECF 34-3], should be struck and

summary judgment for Butner, [ECF 32], should be denied.


Respectfully Submitted,

*/s/ Colin E. Flora*
Eric S. Pavlack
Colin E. Flora
Pavlack Law, LLC
255 N. Alabama St., Ste. 301
Indianapolis, IN 46204
(317) 251-1100
(317) 252-0352 *fax*
*Eric@PavlackLawFirm.com*
*Colin@PavlackLawFirm.com*


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with the Court's ECF system.

Notice of this filing will be sent automatically by operation of the Court's system to all counsel

of record.

*/s/ Colin E. Flora*
Colin E. Flora